UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ANN MARIE HOPKINS,

        Plaintiff,

- against -

NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,

        Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-6138 (RRM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

    Plaintiff Ann Marie Hopkins brings this action against the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the Commissioner's determination that she is not entitled to disability insurance benefits ("SSDI") under Title II of the Social Security Act ("the Act") and supplemental security income benefits ("SSI") under Title XVI of the Act.  Hopkins and the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Def.'s Cross Mot. (Doc. No. 17); Pl.'s Mot. (Doc. No. 15).)  For the reasons set forth below, the Commissioner's motion is denied, Hopkins's motion is granted, and the matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

**I.**    **Hopkins's History**

    On May 20, 2019, the parties filed a joint stipulation of facts.  (Doc. No. 24.)  The facts set forth therein are hereby incorporated in this decision by reference.  Additional facts relevant to this decision are outlined below.

Hopkins was born in Buffalo, New York, on October 26, 1960. (Transcript ("Tr.") (Doc. No. 21) at 27, 150, 156, 223.) She completed high school and graduated from college in 1980 with a bachelor's degree in environmental advocacy. (Tr. at 31, 34.) Hopkins worked as a secretary for multiple law firms and worked through a series of temp agencies. (*Id.* at 31–32, 166, 356.) Hopkins was hospitalized for two weeks in March 2009 due to clinical depression and a suicide attempt. (*Id.* at 151, 156, 165.) Hopkins worked in 2010, 2011, 2012, and 2013, as a sculpture model for an art class at Wagner College, generally working one or two days every three months. (*Id.* at 28–29, 465–66.) Hopkins testified that she received $60 per day for the work. (*Id.* at 360.) In total, Hopkins earned $480.00 in 2010 for 8 days of work, $240.00 in 2011 for 4 days of work, $240.00 in 2012 for 4 days of work, and $720.00 in 2013 for 12 days of work. (*Id.* at 465.) At the time Hopkins filed her application for benefits, the Social Security staff member noted that Hopkins was "not well groomed" and her appearance "was not well put together." (*Id.* at 162.)

## II.     Hopkins's Application for Benefits

Hopkins filed a claim for both disability insurance benefits and SSI on July 2, 2009. (Tr. at 151, 156.) Hopkins stated that her onset of disability was March 1, 2009. (*Id.* at 151.) Hopkins further stated that she was disabled as a result of a nervous breakdown, clinical depression, and a suicide attempt. (*Id.* at 151, 156, 165.) The SSA denied Hopkins's claims on December 1, 2009, finding that she did not meet the definition of disability. (*Id.* at 73.) Hopkins requested a hearing before an administration law judge on December 22, 2009. (*Id.* at 79.) Hopkins appeared at a hearing before ALJ Richard C. Dorf. (*Id.* at 15–59.) ALJ Dorf issued a decision on January 7, 2011, denying Hopkins's applications. (*Id.* at 52–66.) Hopkins appealed

the decision to the Appeals Council, which subsequently denied her appeal, rendering ALJ Dorf's decision final. (*Id.* at 1–5, 9–14.)

Hopkins filed a civil action in this Court, *Hopkins v. Astrue*, 12-cv-4712 (BMC), on September 20, 2012. (Tr. at 386–96.) In an Order issued on April 2, 2013, Judge Cogan remanded the case with the direction that the ALJ was to further develop the record, evaluate and weigh the opinions of the treating physicians in accordance with the Commissioner's rules and regulations, and obtain vocational expert testimony regarding Hopkins's non-exertional impairments. (*Id.* at 397–98.)

On October 13, 2013, Hopkins appeared with counsel for a hearing before ALJ Dina Loewy. (Tr. at 347–83.) At the time of the hearing, there had been no further development of the record, contrary to Judge Cogan's Order. On October 22, 2014, ALJ Loewy issued a decision denying the Hopkins's claim. (*Id.* at 327–46.) Hopkins appealed ALJ Loewy's decision. The Appeals Council denied Hopkins's request for review on July 8, 2013, making ALJ Loewy's decision final. (*Id.* at 318–26.) On October 20, 2017, Hopkins filed this action challenging the Commissioner's decision. (Doc. No. 1.)

**III.   Medical Opinion Evidence**

On May 20, 2019, the parties filed a joint stipulation of facts. (Doc. No. 24.) The facts contained therein are incorporated by reference. The Court addresses other facts to the extent they are relevant to this opinion.

**A.   Medical Opinion of Consultative Examiner Dana Jackson, PhD**

On October 19, 2009, Hopkins was examined by psychologist Dana Jackson, PhD, pursuant to the request of the Commissioner. (Tr. at 222–25.) Dr. Jackson noted that Hopkins was brought to the appointment. Hopkins presented with complaints of depression, anxiety, and

3

PTSD. (*Id.* at 222.) Hopkins reported that when depressed she experienced episodes of increased sleep, crying spells, and suicidal thoughts. (*Id.* at 223.) Hopkins further reported that she attempted suicide in 2008 and 2009 and was presently taking Wellbutrin and Prozac. (*Id.*) Hopkins stated that she had worked at multiple jobs, but could not keep a job because of her mental health issues. (*Id.*)

Dr. Jackson's mental status examination found Hopkins's appearance, behavior, and speech to be normal. (*Id.* at 223.) Hopkins reported having no delusions or hallucinations. (*Id.* at 223–24.) Dr. Jackson noted that Hopkins was oriented and that she had good remote memory and fair recent memory. (*Id.* at 224.) Dr. Jackson opined that Hopkins's attention and concentration were within normal limits and that Hopkins's intelligence was average. (*Id.*) Dr. Jackson opined that Hopkins could cook, clean, shop, take public transportation, and socialize with others. (*Id.*) In the section of the report for diagnosis, Dr. Jackson wrote, "Rule out depressive disorder not otherwise specified." (*Id.*) Dr. Jackson recommended that Hopkins continue with treatment and medication and opined that Hopkins's prognosis was very good. (*Id.* at 225.) Dr. Jackson stated that Hopkins's ability to interact with others was intact. (*Id.*) Dr. Jackson opined that Hopkins did not meet the criteria for PTSD or anxiety and suffered from mild depression. (*Id.*)

B.     **Medical Opinion of State Agency Psychiatric Consultant J. Kessel, M.D.**

On November 30, 2009, state agency psychiatric consultant J. Kessel, M.D., a psychiatrist by designation, reviewed Hopkins's file. (Tr. at 227–46.) Dr. Kessel opined that a residual functional capacity ("RFC") evaluation was necessary and that Hopkins suffered from an affective disorder. (*Id.* at 227.) Dr. Kessel further opined that Hopkins did not suffer from an organic mental disorder or psychotic disorder and that Hopkins suffered from a mood disorder

4

that did not satisfy the diagnostic criteria for major depressive disorder, as she had benefitted from treatment.  (*Id.* at 228–30.)  Dr. Kessel also concluded that Hopkins did not suffer from mental retardation, anxiety disorders, somatoform disorders, or personality disorders.  (*Id.* at 231–34.)  Dr. Kessel stated that Hopkins suffered from a substance addiction disorder and noted a history of alcohol abuse, but Hopkins denied any active substance abuse.  (*Id.* at 235.)  Dr. Kessel opined that Hopkins did not suffer from an autistic disorder.  (*Id.* at 236.)

      Dr. Kessel determined that Hopkins had mild limitations in activities of daily living; mild limitations in maintaining social functioning; mild limitations in maintaining concentration, persistence and pace; and had no repeated episodes of deterioration of extended duration.  (*Id.* at 237.)  Dr. Kessel opined that the C criteria were not met.  (*Id.* at 238.)  Dr. Kessel also opined that Hopkins was not significantly limited in remembering locations and work procedures, in understanding and remembering short and simple instructions, in carrying out short and simple instructions, in maintaining attention and concentration, in keeping a regular schedule, in sustaining an ordinary schedule without supervision, in working in coordination with others without being distracted, in completing a normal workday or workweek, in appropriately interacting with the public, in asking simple questions, in accepting instruction or criticism from supervisors, in getting along with coworkers without distracting them, in maintaining socially appropriate behavior, in being aware of hazards and taking precautions, in using public transportation or traveling to unfamiliar places, in setting realistic goals, or in working independently of others.  (*Id.* at 241–42.)  Dr. Kessel opined that Hopkins had a moderate limitation in understanding and remembering detailed instructions, in carrying out detailed instructions, and in responding appropriately to changes in the workplace.  (*Id.* at 242.)

Dr. Kessel added that Hopkins was noted to have shown a good response to treatment, had fair ADL's, was independent in travel, had some social contacts, was not psychotic or suicidal, and was cognitively intact. (*Id.* at 243.) While Dr. Kessel noted that Hopkins had some limitations in adaptation, Dr. Kessel specified that they appeared to be less than significant. (*Id.*)

      C.      **Medical Opinion of Treating Psychiatrist Elpidio Marlon Garcia, M.D.**

On October 13, 2010, Dr. Elpidio Marlon Garcia, M.D., a psychiatrist, completed a Residual Functional Capacity Questionnaire. (Tr. at 252–55.) Dr. Garcia noted that Hopkins had been in treatment at the hospital since 2004 and had been admitted for treatment of severe mental illness on January 2, 2009. (*Id.* at 252.) Dr. Garcia opined that Hopkins suffered from recurrent major depression and severe anxiety. (*Id.*)

Dr. Garcia stated Hopkins suffered from symptoms "related to biological causes of mental illness as well as physical abuse and emotional abuse by men." (*Id.* at 252.) According to Dr. Garcia, Hopkins had a history of depression and anxiety, poor coping skills, and was both "hopeless" and "helpless" at the time of examination. (*Id.*) Dr. Garcia stated that Hopkins's condition was severe enough to necessitate weekly treatment and that she had been hospitalized from April 6, 2010, through April 15, 2010, for a suicide attempt. (*Id.*) Dr. Garcia noted that Hopkins was being evaluated at the George A. Jervis Clinic and was suffering from Asperger's or autism. (*Id.* at 253.)

Dr. Garcia explained that it would be difficult for Hopkins to travel alone while symptomatic and "paranoid," as travel under those circumstances had caused problems in the past. (*Id.* at 253.) Dr. Garcia opined that Hopkins had a marked limitation in activities of daily living; an extreme limitation in maintaining social functioning; a marked limitation in concentration, persistence and pace; and repeatedly experienced episodes of decompensation of

6

extended duration. (*Id*. at 254.) Dr. Garcia stated that Hopkins had no psychotic thoughts, but was sometimes unable to function outside her home due to anxiety. (*Id.*) Dr. Garcia noted a marked limitation in understanding, remembering and carrying out instructions; a marked limitation in responding to supervision; a severe limitation in responding appropriately to co-workers; a marked to severe limitation satisfying normal attention and production rates; a severe limitation in the ability to perform complex tasks; and a marked limitation in the ability to perform simple tasks. (*Id.* at 254–55.) Finally, Dr. Garcia noted that when severely symptomatic Hopkins would "completely break-down [sic]." (*Id.* at 255.)

      **D.**      **Joint Medical Opinions of Elpidio Garcia, M.D. and Digna McGrail, LCSW**

On October 13, 2011, Dr. Garcia and licensed clinical social worker Digna McGrail completed a Medical Evaluation form. (Tr. at 313–17.) Dr. Garcia and McGrail noted that Hopkins was diagnosed with bipolar disorder and a personality disorder and that Hopkins had been diagnosed at the George A. Jervis Clinic with a Communication Disorder/Asperger's. (*Id.* at 313.) Dr. Garcia and McGrail also noted that Hopkins had experienced psychosis. (*Id.*) They noted that the Hopkins's impairment had lasted or could be expected to last 12 months. (*Id.* at 314.)

Dr. Garcia and McGrail opined that in the area of daily living activities Hopkins had marked difficulty with grooming, housecleaning, shopping, cooking, paying bills, using telephones, planning daily activities, initiating and participating in activities, keeping appointments, and interacting with others. (*Id.* at 315.) They opined that with regard to social functioning Hopkins had marked difficulty communicating clearly and effectively, getting along with family members, making and getting along with friends, getting along with strangers, getting along with others, showing consideration for others, displaying awareness of others'

7

feelings, responding to those in authority, holding a job, avoiding being fired, avoiding altercations, avoiding eviction, avoiding social isolation, and interacting in groups. (*Id.* at 315–316.) Dr. Garcia and McGrail stated that Hopkins was "extremely sensitive." (*Id.* at 316.) They opined that she experienced deficiencies of concentration and pace, and at times could not process things—although she was very intelligent. (*Id.* at 316.) They also opined that Hopkins experiences episodes of deterioration and exhibits symptoms of withdrawal and psychotic behavior. (*Id.*) They wrote that she can become depressed, frustrated, and suicidal if lacking support and medication. (*Id.*) Dr. Garcia and McGrail opined that Hopkins needed to address both her mental illness and her son's mental illness. (*Id.*)

McGrail also wrote an undated letter countersigned by Dr. Garcia. (*Id.* at 495.) The letter notes that Hopkins was diagnosed with major depression, recurrent, as well as a communication disorder, which McGrail specifies is Asperger syndrome. (*Id.*) The letter also states that Hopkins was diagnosed with Asperger syndrome at the George A. Jervis Clinic and additionally that Hopkins suffers from a personality disorder. (*Id.*) The letter notes that Hopkins has a GAF score of 56. (*Id.*) McGrail stated that Hopkins wished to be employed but suffered from severe symptoms of anxiety and depression, which interfered with even minute tasks. (*Id.*)

McGrail also wrote a narrative letter dated April 19, 2012, which requested that Hopkins receive in-home services in order to avoid hospitalization. (*Id.* at 496.) The letter states that Hopkins was severely and persistently mentally ill, that Hopkins had been evaluated at the George A. Jervis Clinic and diagnosed with Asperger's, and that the condition exacerbated Hopkins's severe anxiety and major depression. (*Id.*)

E.   **Medical Opinion of Consultative Examiner Brickell Quarles, PhD**

On August 31, 2013, Hopkins was examined by psychologist Brickell Quarles, PhD, pursuant to the request of the Commissioner. (Tr. at 485–89, 490–91.) Dr. Quarles noted that Hopkins took the bus to the appointment. (*Id.* at 485.) According to Dr. Quarles, Hopkins reported that she suffered from clinical depression and had been diagnosed with PTSD and with Asperger's around the age of 50. (*Id.*) Dr. Quarles noted that Hopkins reported depressive symptoms of oversleeping, isolating herself, being easily annoyed, crying spells, fair concentration, and variable appetite. (*Id.* at 486.) Dr. Quarles added that Hopkins reported both suicide attempts and symptoms of anxiety, including freezing up when talking to others. (*Id.*) Hopkins also reported problems with authority figures. (*Id.*) Dr. Quarles noted that Hopkins reported a 10 to 14-day hospitalization, two suicide attempts, and a history of depression. (*Id.*) Hopkins further reported she attended weekly therapy in both individual and group treatment, family therapy with her son, and took the psychiatric medications Prozac and Abilify. (*Id.*) Dr. Quarles noted that Hopkins reported past, but not recent, alcohol abuse, past physical and emotional abuse, and no history of drug abuse. (*Id.*)

Dr. Quarles stated that Hopkins's longest reported job was for two years. (*Id.* at 487.) Hopkins stated she had a hard time getting along with bosses and either quit or got fired from jobs due to her emotional problems. (*Id.*) In analyzing Hopkins's mental status, Dr. Quarles described Hopkins as calm, said she was fairly groomed and dressed, avoided eye contact, had clear and coherent speech, had logical thoughts, did not display psychotic or delusional thinking, had a neutral mood, and had a blunted affect. (*Id.* at 487–88.) Dr. Quarles opined that Hopkins's "allegation" appeared consistent with the examination. (*Id.* at 488.)

Dr. Quarles diagnosed Hopkins with major depressive disorder, recurrent; history of alcohol abuse; and "[r]ule out personality disorder, not otherwise specified." (*Id.* at 488.) Dr. Quarles recommended that Hopkins continue with both therapy and medication. (*Id.* at 489.) Dr. Quarles added that therapy would help Hopkins gain insight into both her problems with social functioning and emotional regulation. (*Id.*) According to Dr. Quarles, Hopkins's prognosis was fair given her long history of depression and abuse. (*Id.*) Dr. Quarles opined that Hopkins could learn and follow simple directions; that Hopkins could perform simple tasks, but appeared limited in maintaining attention and concentration; that Hopkins could maintain a regular schedule, but her mental impairments would impact her ability to complete tasks; and that Hopkins's ability to learn and perform complex tasks might be affected by her attention and concentration issues. (*Id.* at 489–91.) Dr. Quarles opined that Hopkins should continue to participate in therapy and medication management in order to improve her emotional stability and functioning. (*Id.* at 491.)

**IV.    ALJ Hearing**

The hearing in this matter began with ALJ Loewy advising Hopkins's attorney that there were no medical records in the file from after 2010. (Tr. at 352.) ALJ Loewy raised the possibility of adjourning the hearing. (*Id.*) ALJ Loewy asked Hopkins if she was in treatment and whether she had been hospitalized. (*Id.* at 354.) Hopkins advised that she saw Dr. Garcia once a month, saw her psychologist once a week, and had not been hospitalized since 2009. (*Id.*) ALJ Loewy decided to go forward with the hearing. (*Id.*)

Hopkins testified that she has two children and that her son, age 15, lives with her part-time. (Tr. at 355.) She testified that her son has Asperger's and goes to a residential school.

10

(*Id.*)  Hopkins went on to describe the previously outlined facts regarding her educational history, her work history, and her suicide attempt.  (*Id.* at 356–64.)

Hopkins testified that since her son had been in a residential school, she did not go out much and slept most of the day.  (*Id.* at 364.)  She stated that she has only one friend, who she sees once or twice per month.  (*Id.* at 365.)  She testified that she reads, but not daily, and that she had a drinking problem for about a year following 9/11.  (*Id.* at 366.)  She stated that she takes the medications Abilify and Prozac.  (*Id.* at 367.)  Hopkins testified that she has problems with authority figures and had bad reviews at jobs she stayed at long enough to be reviewed.  (*Id.* at 368.)  She stated that she was told she was too direct when talking to others.  (*Id.*)  Hopkins further stated that she did not understand what she did wrong and that she left jobs after she had supervisors yell at her.  (*Id.* at 368–69.)  Although she was fired from numerous jobs, Hopkins explained, the temp agency she used was able to get her other placements.  (*Id.* at 369.)  Hopkins testified that she lifted 8–10 pounds when working as a data entry clerk.  (*Id.* at 374.)

Hopkins stated that she became increasingly depressed after 2011, when the temp agency would no longer place her in jobs.  (*Id.* at 362.)  Hopkins testified that she did not think she could work because she cannot get out of the house much, has a lot of aches and pains, sleeps for 15 to 16 hours a day, and cannot concentrate.  (*Id.*)  Hopkins further testified that even small changes in her routine were a huge ordeal for her.  (*Id.* at 369.)  Hopkins stated that she attempted suicide several times and was hospitalized for the last attempt in 2009.  (*Id*. at 362–63.)  Hopkins testified that her condition worsened after the suicide attempt and never got better.  (*Id.* at 363–64.)  She no longer showers daily and takes a shower once a week.  (*Id.* at 371.)

Vocational Expert Andrew Pasternak also testified at the hearing.  (*Id.* at 374.)  ALJ Loewy recounted Hopkins's testimony to the vocational expert, stating that Hopkins had a

11

bachelor's degree, testified that she was a legal secretary, and that she had self-employment selling CD's on eBay for which she lifted up to 20 pounds. (*Id.* at 373.) Pasternak testified that Hopkins's past work as a legal secretary was sedentary and had an SVP of six, and that Hopkins's work in data entry person required light exertion and had an SVP of four. (*Id.* at 375.) ALJ Loewy directed Pasternak to consider a hypothetical individual with the same age, education, and past work history as Hopkins, who had no exertional limits, but who was limited to simple, routine tasks, with only occasional changes in routine and only occasional, superficial contact with others. (*Id.* at 375–76.) Pasternak first noted that those hypothetical conditions would eliminate Hopkins's past work. (*Id.* at 376.) Pasternak then testified that such a hypothetical person could work as a hand packager, DOT 920.587-018, medium work, SVP 2; as a garment sorter, DOT 222.687-014, light, SVP 2; and an assembler, DOT 780.684-062, light, SVP 2. (*Id.* at 377.) The vocational expert testified that if the additional limitation was added that there be no fast-paced production quotas, the assembler job would be eliminated. (*Id.*) Pasternak offered the alternate job of office cleaner, DOT 381.687-014, heavy, SVP 2. (*Id.* at 378.)

ALJ Lowey asked if being off task 20% of the day would eliminate these jobs. (*Id.* at 378.) The vocational expert testified that it would eliminate all of them. (*Id.* at 378.) Upon questioning by Hopkins's attorney, Mr. Pasternak testified that the maximum time allowed off task would be 15%. (*Id.* at 379.) The vocational expert also stated that absences of one time per month would be tolerated, but that two days absent per month would only be tolerated by some employers and only with good reason. (*Id.*)

V.     **ALJ Loewy's Decision**

On October 22, 2014, ALJ Loewy issued her written decision finding Hopkins not disabled within the meaning of the SSA.  (Tr. at 327–46.)  In the decision, ALJ Loewy followed the familiar five-step process for making disability determinations:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix I of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.  [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4).

At step one, ALJ Loewy found that Hopkins had not engaged in substantial gainful activity since the alleged onset date of March 1, 2009.  (Tr. at 332.)  At step two, ALJ Loewy found that Hopkins was severely impaired by the following ailments: major depressive disorder, borderline personality disorder, and a history of alcohol abuse.  (*Id.*)  ALJ Loewy noted that Hopkins had a rule out diagnosis of Asperger's disorder, but added that rule out diagnoses were not formal diagnoses and therefore not considered medically determinable impairments.  (*Id.* at 332–33.)  ALJ Lowey went on to note that Hopkins had a communication disorder, but found that Hopkins was well-spoken and showed no speech impediments so the condition was non-severe.  (*Id.*)  ALJ Loewy found that Hopkins had a mild limitation in activities of daily living; had a moderate limitation in social functioning; had a moderate limitation in concentrating,

13

persisting, and maintaining pace; and had experienced no episodes of decompensation of extended duration. (*Id.* at 333–34.)

At step three, after considering Listing 12.04, ALJ Loewy found that these impairments did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1 of the regulations. (*Id.* at 334.) ALJ Loewy considered the paragraph C criteria for Listing 12.04 and found that they were not met. (*Id.*)

Next, in analysis germane to steps four and five, ALJ Loewy assessed Hopkins' RFC. She determined that Hopkins had the RFC "to perform a full range of work at all levels but with the following non-exertional limitations: the claimant is able to perform simple routine tasks that consist of only simple decisions, only occasional changes in routine and superficial contact with others and no fast paced production quotas. Additionally, Hopkins's work will allow her to be off task 10 percent of the workday." (*Id.* at 334–35.)

In making this determination, ALJ Loewy gave "little weight" to the opinions of the treating sources Dr. Garcia and Ms. McGrail, stating that Hopkins's treatment notes show that she is capable of engaging in group therapy sessions, thereby showing an ability to relate in a small setting; that Hopkins had only one suicide attempt; that Hopkins was able to parent her child; and that Hopkins's GAF scores were in the moderate range. (*Id.* at 337–38.) ALJ Loewy gave "some weight" to the opinion of consultative examiner Dana Jackson, PhD, stating that the treatment records do show that there is a need for treatment and medication. (*Id.* at 336–37.) ALJ Loewy gave "some weight" to the opinion of state agency analyst Dr. Kessel overall, but gave "great weight" to the portion of his opinion that Hopkins could perform unskilled work. (*Id.* at 337.) Lastly, ALJ Loewy gave great weight to the opinion of Consultative examiner Brickell Quarles, PhD. (*Id.* at 338.) ALJ Loewy repeatedly noted that Hopkins "had

14

consistently worked one day a week as a sculpture model" thereby showing that she was able to adhere to a schedule, be around others and perform unskilled work. (*Id.* at 336, 339.)

At step four, ALJ Loewy found that Hopkins could not return to her past relevant work as a legal secretary and data entry clerk. (*Id.* at 339.) Finally, at step five, ALJ Loewy found that there existed a significant number of jobs in the national economy that Hopkins could perform. (*Id.* at 340.) Accordingly, ALJ Loewy found that Hopkins was not disabled within the meaning of the SSA from March 1, 2009, through the date of the decision. (*Id.* at 340–41.)

## STANDARD OF REVIEW

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, a court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chafer*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted). Instead, an ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." *See id.* (citation omitted).

## DISCUSSION

### I. Development of the Record

It was the prior order of Judge Cogan that ALJ Loewy develop the medical record in this matter. (Tr. at 397–398.) ALJ Loewy failed to do so. The hearing transcript indicates that ALJ Loewy knew that Hopkins's medical records were not a part of the file but proceeded with the hearing. (*Id.* at 352–54.)

Setting aside the violation of the prior Order, however, a more fundamental error remains: ALJ Loewy plainly failed to consider the fact that Hopkins had been diagnosed with Asperger syndrome. While it appears true that Hopkins's diagnosis of Asperger's was initially a "rule out" diagnosis, the record is clear that Hopkins was in fact subsequently diagnosed with Asperger's by the George A. Jervis Clinic, a facility which was licensed and recognized by the New York State Office for People with Developmental Disabilities as a proper facility to diagnose autism disorders. (*Id.* at 495–96.) While ALJ does appear to have issued two subpoenas after the hearing for the records of the Richmond University Medical Center, there was no attempt made to obtain the records of the George A. Jervis Clinic despite the fact that the file contained letters from Dr. Garcia and Ms. McGrail indicating that Hopkins had been evaluated at the George A. Jervis Clinic and diagnosed with Asperger syndrome. (*Id.*)

It is error for an ALJ to overlook an obvious inference from a medical record that there are additional, relevant records outstanding. According to the SSA regulations, the Commissioner must "make every reasonable effort" to assist the claimant in developing a "complete medical history." 20 C.F.R. § 404.1512(d). Furthermore, "[i]t is the rule in our circuit that the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. This duty . . . exists even

16

when, as here, the claimant is represented by counsel." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations and quotations omitted). ALJ Loewy was required to make "every reasonable effort" to obtain reports from medical sources to fill gaps in the administrative record. 20 C.F.R. § 416.912.

In this case, there were medical records that were outstanding from qualified medical sources who were not only licensed physicians, but in fact specialized experts. Those records pertained to what the treating psychiatrist noted to be one of Hopkins's underlying mental impairments, Asperger syndrome. Those records could have been expected to be highly probative and highly relevant. Thus, the record here was incomplete. It is not possible to assess the severity of Hopkins's condition without those records. For that reason, the Court must remand with the direction that the records from the George A. Jervis Clinic be obtained.

## II.     Weight of Treating Physicians' Opinions

Under the treating physician rule, an ALJ is bound to give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)" where that opinion is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *accord Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. At the time of ALJ Loewy's decision, a "treating source" was defined as a claimant's "physician, psychologist or other acceptable medical source" who provides, or has provided, the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 404.1502, 416.902 (2016).

17

When controlling weight is not given to a treating physician's opinion, an ALJ must give "good reasons" for whatever weight is assigned. *Halloran*, 362 F.3d at 32. In doing so, the ALJ is bound to consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's opinion; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134. Where the ALJ does not appear to have taken into consideration these factors, the Court cannot find that the ALJ has given good reasons. *See, e.g.*, *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014 WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014). In such circumstances, remand is appropriate. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Failure to provide such good reasons for [declining to credit] the opinion of a claimant's treating physician is a ground for remand." (citations and internal quotation marks omitted)).

Here, ALJ Loewy erred when, in determining Hopkins' RFC, she assigned little weight to opinions of the treating sources without offering good reasons for doing so and without addressing all the factors to be considered. (Tr. at 337–38.) Explaining that Dr. Garcia's opinions were entitled to "little weight," ALJ Loewy claimed that they were not consistent with the record that Hopkins could engage in group therapy, that Hopkins only had one documented suicide attempt, that Hopkins was found capable of parenting her child, and that Hopkins's GAF scores fell in the moderate range. (*Id.*)

These are not good reasons. First, they are sparse – focusing on only one of the several factors, consistency with the record as a whole, that the regulations require ALJs to consider in

18

these circumstances. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6); 416.927(c)(2)–(6). ALJ Loewy did not discuss, for example, the nature or extent of the doctors' relationship with Hopkins, or the fact that Dr. Garcia is a specialist in mental health disorders. *See Sanchez*, 2014 WL 4065091, at *12. Second, the fact that, Dr. Garcia assigned a GAF score indicating moderate limitations does nothing to undermine his more detailed conclusions that Hopkins limitations were more severe. On facts substantively indistinguishable from those here, the Second Circuit recently held that GAF scores which are "bereft of explanation" do not furnish a good reason to disregard the otherwise supported opinion of a treating psychiatrist. *See Estrella v. Berryhill*, 925 F.3d 90, 97–80 (2d Cir. 2019). Finally, Dr. Garcia and Ms. McGrail were the two most prominent members of the Richmond University Medical Center team of mental health professionals that had treated Hopkins since 2004. Both of those sources had a lengthy and extensive history of treatment. This was not considered.

In sum, ALJ Loewy failed to give "good reasons" for discounting the opinion of Hopkins' most prominent treating physician, and in doing so, she violated the treating physician rule. *See Halloran*, 362 F.3d at 32.

## CONCLUSION

For the reasons set forth herein, the Commissioner's cross-motion for judgment on the pleadings is denied and Hopkins's motion for judgment on the pleadings is granted to the extent it seeks remand. This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Order. The Clerk of Court is respectfully directed to enter judgment accordingly and to close this case.

19

|  |  |
|---|---|
|  | SO ORDERED. |
| Dated: Brooklyn, New York<br>May 18, 2020 | *Roslynn R. Mauskopf*<br>_____<br>ROSLYNN R. MAUSKOPF<br>Chief United States District Judge |

20